UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GILLIAN CONROY,                                      Case No. 3:14-CV-01580-AC

                Plaintiff,                          OPINION AND
                                                            ORDER
      v.

HEWLETT-PACKARD COMPANY,
a Delaware Corporation,
                Defendants.

_____

ACOSTA, Magistrate Judge:

*Introduction*

      Plaintiff Gillian Conroy ("Conroy") filed this lawsuit against her former employer, Hewlett-

Packard Company ("Hewlett"). The claims, as set forth in the First Amended Complaint filed

November 3, 2014, (the "Complaint") are for gender discrimination and retaliation under state law.

Hewlett has filed a motion for summary judgment on both claims. For the reasons set forth below,

summary judgment on Conroy's retaliation claim based on OR. REV. STAT. 659A.199 and OR. REV.

STAT. 659A.230 is denied, and summary judgment on Conroy's gender discrimination claim based on OR. REV. STAT. 659A.030 is granted.

*Preliminary Procedural Matters*

As a preliminary matter, the court addresses Hewlett's evidentiary objections. In its Reply in Support of Summary Judgment, Hewlett objects to numerous portions of Conroy's deposition and declaration, as well as exhibits offered by Conroy in support of her summary judgment opposition. In response, Conroy asserts her evidence is based on personal knowledge and falls under applicable hearsay exceptions.

A trial court can only consider admissible evidence in ruling on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). For summary judgment purposes, a declaration is admissible if it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the . . . declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4) (2015). In ruling on a motion for summary judgment, the court will consider the admissibility of the proffered evidence's contents, not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

I. Objections pertaining to Conroy's personal opinions of her job skills, duties, performance, and treatment in the workplace

Hewlett objects to various statements – taken from Conroy's deposition, declaration, and exhibits offered by Conroy in support of her summary judgment opposition – in which Conroy asserts either that: (1) she was hired into an incorrect job; (2) her job skills qualified her for a different job; (3) she should have had a higher rating on her performance reviews; or (4) she was discriminated against. Pursuant to Rule 601 of the Federal Rules of Evidence ("Rule 602"), Hewlett

maintains that Conroy lacks personal knowledge to make such statements.

Rule 701 of the Federal Rules of Evidence ("Rule 701") permits a lay person to offer testimony in the form of an opinion if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 has a firsthand knowledge requirement, which can be met if the witness demonstrates firsthand knowledge or observation. *United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014). The personal knowledge requirement under Rule 602 is the same as that under Rule 701(a). *Id.* at 864.

Conroy's personal opinions regarding her job duties, job skills, performance ratings, and whether she was discriminated against will be considered by the court. Conroy has nearly six years of experience working for Hewlett and, accordingly, has personal knowledge of her job description as well as her job duties and experiences at the workplace. (Pl. Am. Compl. ¶ 6 (ECF No. 18.).) Conroy is competent to offer her opinion pertaining to such matters. However, the court will consider these statements as Conroy's personal observations and not as evidence that the stated observations are true in fact.

II. Additional objection to a matter over which Conroy has personal knowledge

Hewlett objects to Paragraph 11 of Conroy's declaration in which she states George Dedes ("Dedes") started in her former role as a Worldwide Channel Manager earning a salary of $130,000 per year, despite having a less-extensive background and fewer credentials than she did. To the extent Conroy is testifying to her opinion that Dedes's background and credentials were inferior to hers, she is entitled to do so. Conroy hired Dedes as a temporary employee while working in the Worldwide Channel Manager position and, thereafter, had personal knowledge of the information

provided to her. (Conroy Dep. 150:12-19.) However, the court will consider these statements as Conroy's personal observations and not as evidence that the stated observations are true in fact.

III. Objections pertaining to statements for which Conroy lacks personal knowledge

Hewlett first objects to Conroy's statement that she discovered a man had been hired for a Services Business Manager position on Hewlett's commercial side that Conroy sought and helped create. (Conroy Dep. 25:10-26:9.) This unidentified man, according to Conroy, lacked the necessary experience for the position and was previously laid off by Hewlett. (Conroy Dep. 25:10-26:9.) Conroy testified she neither saw firsthand, nor could she identify, the man who was hired for the position she helped create. (Conroy Dep. 25:10-27:23.) In addition, despite her statement that this man lacked the experience necessary for the position, Conroy also testified she never saw the man's résumé. (Conroy Dep. 26:24-27:1.) Finally, Conroy does not, nor has she ever, worked in Hewlett's Human Resources Department and, consequently, has no knowledge of Hewlett's actions or thoughts when it comes to whom Hewlett chooses, or chose, to hire. Therefore, Hewlett's objection is sustained.

Hewlett next asserts Conroy lacks personal knowledge to state Sheryl Foster ("Foster") lacked an enterprise group hardware background. (Conroy Dep. 74:20-75:7.) Conroy worked with Foster for a year. (Conroy Dep. 54:2-12.) If Conroy offered opinion testimony regarding her perception of Foster's management skills during this period, Conroy would be competent to do so. *See* FED. R. EVID. 701 (2015) (permitting a lay person to offer testimony in the form of an opinion if it is rationally based on the witness's perception). However, Conroy does not provide any information on her personal knowledge of Foster's employment background, let alone her enterprise group hardware background. To the extent Conroy seeks to offer testimony regarding her knowledge

of Foster's employment or enterprise group hardware background, Conroy is not competent to do so. Hewlett's objection is sustained.

Third, Hewlett objects to Conroy's deposition testimony that Foster knew of Conroy's complaints of pay equity and that Conroy had filed a sex discrimination claim against Hewlett. (Conroy Dep. 66:1-9.) Conroy states she does not know how Foster knew of Conroy's pay-inequity or sex discrimination complaints. (Conroy Dep. 66:6.) Conroy does not offer evidence establishing personal knowledge of Foster's awareness of Conroy's complaints. Hewlett's objection is sustained. However, Conroy is permitted to rely on the statement made by Foster that she was made aware of Conroy's sex discrimination claim against Hewlett. FED. R. CIV. P. 56(c)(1) (stating that a party who is asserting a fact may cite to material in the record, including depositions).

Fourth, Hewlett objects to statements made by Conroy in her declaration. In Paragraph 7(a), Conroy asserts, in an effort to fill the West Marketing Development Manager role, Hewlett was looking for an employee with senior-level marketing experience, who was also competent to talk solutions, hardware, and software with the sales team and with management. Conroy does not provide any information on her personal knowledge of the type of employee Hewlett sought to hire for the West Marketing Development Manager role. Finally, as stated, Conroy does not, nor has she ever, worked in Hewlett's Human Resources Department and, consequently, has no knowledge of Hewlett's actions or thoughts when it comes to whom Hewlett chooses, or chose, to hire. Hewlett's objection is sustained.

Finally, in Paragraph 8, Conroy represents Stan Grant ("Grant") "was a products guy and had never done marketing." (Conroy Decl. ¶ 8 (ECF No.35).) Conroy does not provide any information on her personal knowledge of Grant's work background. Hewlett's objection is sustained.

IV. Objections asserting Conroy misstates the facts

Hewlett asserts there are numerous instances in which Conroy misstates the facts, is misleading, or mischaracterizes the testimony. The court's duty in reviewing a summary judgment motion is to look at the evidence presented to it by the parties and, initially, determine if there is a genuine issue of material fact. FED. R. CIV. P. 56. The court limits its consideration of the facts to those contained in the proffered evidence, not descriptions or summaries of fact found in the parties' briefing. To the extent the statements made in the parties' briefing differ from the facts established in the submitted depositions, declarations, and exhibits, the court will ignore the statements made in the briefing.

V. Hearsay objections

Hewlett challenges as hearsay a number of out-of-court statements made by Conroy's managers or superiors to Conroy. Hearsay is defined as an out-of-court statement, written or oral, offered into evidence to prove the truth of the matter asserted. FED. R. EVID. 801 (2015). Hearsay is admissible only if it qualifies as an exemption or exception to the general hearsay rule. FED. R. EVID. 802 (2015). The Ninth Circuit has generally applied the limitations found in the hearsay rule to evidence offered by parties at the summary judgment stage. *Orr v. Bank of Am. NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002); *Beyenne v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the general hearsay rule. FED. R. EVID. 805 (2015); *United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997). A statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID.

801(d)(2)(D).  However, this rule requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment. *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999).

While the statements are made by managers or supervisors employed by Hewlett, making them Hewlett's agents for certain matters, Conroy has not carried her burden to provide the court with evidence that these private statements were made within the scope of the agents' employment. Hewlett's objections are sustained.

Similarly, Hewlett challenges Conroy's statement that Patricia Koetting ("Koetting"), Conroy's peer, informed her that Hewlett gave Jeremy Willenborg ("Willenborg") a director-level position and a large pay raise in order to retain Willenborg, while, around the same time, Foster told Conroy she could not be given a pay raise of more than two percent.  (Conroy Dep. 57:19-58:5.) Much like the above comments, Conroy has provided no indication that Koetting's statement was within the scope of Koetting's employment.  As the proffering party, Conroy is required to lay the foundation showing an otherwise excludable statement is within an agent's employment. As such, Hewlett's objection is sustained.

Hewlett next objects to Conroy's discussion of Koetting's conversations with Allison Cerra ("Cerra"), Foster, and other senior-level Hewlett officials, which allegedly addressed Ann Kroll's ("Kroll") lack of strategic awareness.  (Conroy Dep. 218:4-10.)  A lay opinion witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014).  There is no indication Conroy has firsthand knowledge of Koetting's conversations; instead, Conroy appears to be relying on speculation and hearsay.  Moreover, while the statements appear to be made by Hewlett's agents, Conroy is required

to lay the foundation showing an otherwise excludable statement is within an agent's employment. She has not done so, and Hewlett's objection is sustained.

In similar fashion, Hewlett objects to Conroy's deposition testimony in which she states an employee in the Equal Employment Opportunity Commission's ("EEOC") Seattle office told her the EEOC had notified Hewlett about her EEOC charge. (Conroy Dep. 206:3-9.) Conroy does not have personal knowledge of the EEOC's contact with Hewlett. To the extent Conroy relies on a statement by an EEOC employee, that statement is hearsay and is inadmissible. Hewlett's objection is sustained.

Hewlett also objects to Conroy's deposition testimony where she states she believes the core of her account-based management position was left intact. (Conroy Dep. 201:18-24.) Conroy believes this because the job title and description of the position were listed on Kroll's LinkedIn profile. (Conroy Dep. 201:25-203:7.) "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." FED. R. EVID. 1002. Kroll's LinkedIn profile is the best evidence of its own content, and, therefore, Conroy's reference to the contents of Kroll's LinkedIn profile violates the best evidence rule. Hewlett's objection is therefore sustained.

Finally, Hewlett contests Conroy's assertion that Foster had been telling people about Conroy's EEOC complaint and her "issues" with Conroy asking for raises. (Conroy Dep. 162:4-9.) When asked how she knew Foster had been making such statements, Conroy responded that Cerra discussed Foster's assertions in an e-mail sent to Hewlett's Human Resources Department. (Conroy Dep. 162:4-9.) Conroy's reference to contents of an e-mail sent by Cerra violates the best evidence rule. *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007) (stating references to the content of e-mails violates the best evidence rule).

VI. Objections to Attachments A, B, and C of Conroy's declaration

Hewlett objects to Attachments A and B of Conroy's declaration, asserting the attachments are hearsay. Attachment A is a modified version of Exhibit 6 from Cerra's Declaration, which is Foster's compiled employee-evaluation form. Under each category of the evaluation form, Conroy has changed the rating she and other employees on Foster's team received to the rating Conroy believes each employee deserved to receive. In Attachment B, Conroy walks through each category in the evaluation form and explains why she believes her and other employees' ratings should have been different.

At the summary judgment phase, the court does not focus on the admissibility of the evidence's form, bur rather the admissibility of its contents. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Thus, the court need not decide whether these attachments are themselves admissible; it is sufficient if the contents of the attachments are admissible or could be presented in admissible form at trial. *Id.*

To the extent Attachments A and B contain recitations of matters within Conroy's personal knowledge and, therefore, contain statements that could be admitted at trial – for instance, through personal testimony – the court will consider Attachments A and B.

Hewlett also objects to Attachment C of Conroy's declaration, claiming Attachment C is hearsay. Attachment C appears to be a printout of Hewlett's geographic pay policy, possibly taken from its website.

For a printout of a website to admissible, it must be properly authenticated Under Rule 901(a) of the Federal Rules of Evidence. *See Osborn v. Butler*, 712 F. Supp. 2d 1134, 1146 (D. Idaho 2010) (explaining a website printout must be properly authenticated for a court to consider it on summary

judgment). In *Osborn*, the defendant attached a website printout to an affidavit filed in support of the defendant's motion for summary judgment. *Id.* The court determined the defendant had properly authenticated the website printout because the defendant provided the website address in the affidavit, explained in the affidavit he had printed the website himself, and represented it had not been altered or change from its original form. *Id.*

Conroy has failed to properly authenticate the website. Unlike *Osborn*, Conroy neither provides the website address in an affidavit attached to the printout, nor does she state she printed the website herself. And, perhaps most important, Conroy provides no representation that the website has not been altered from its original form.

Moreover, even if it were properly authenticated, the statements made in the website printout are inadmissible hearsay. In *Van Westrienen v. Americontinental Collection Corp.*, 94 F. Supp. 2d 1087, 1110 (D. Or. 2000), this court admitted contents of a website for purposes of a summary judgment motion as an admission of a party opponent because the defendant's correspondence identified that it had published the website's written contents. But here, neither Conroy nor Hewlett has identified Hewlett as the publisher of the website's written contents. Conroy states only that Attachment C describes how Hewlett's pay policies work, not who authored the website's written contents. Without verification that Hewlett authored the contents, the written contents of the website are inadmissible hearsay. Therefore, Hewlett's objection is sustained.

VII. Irrelevant Evidence

Hewlett objects to a statement made by Conroy in Paragraph 7(a) of her declaration on personal knowledge grounds. In Paragraph 7(a), Conroy states that, upon being laid off, Kroll wanted to know how to take over Conroy's launch of a national partnership with Fusion-io to

promote Hewlett's big data solutions. According to Conroy, the launch took marketing strategy and execution know-how. The court need not address Hewlett's objection because it finds the evidence irrelevant.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401 (2015). Naturally then, in an employment-discrimination and whistleblowing case, that means evidence that has a tendency to show either discrimination in the workplace or retaliation. To determine whether Conroy's proffered evidence is relevant, it is helpful to look at the requirements necessary to show employment discrimination or retaliation. *See United States v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011) (stating that, to determine relevancy, it is particularly helpful to examine the requirements necessary to show the alleged violation). To establish discrimination, Conroy needs to show that similarly situated employees were treated more favorably than she. *Earl v. Neilson Media Research, Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011). To establish retaliation, Conroy must show she was engaged in a protected activity, she was thereafter subjected to an adverse employment action by her employer, and a casual link between the protected activity and the adverse employment action exists. *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003).

That Kroll wanted to know how to take over Conroy's national partnership launch with Fusion-io provides little in the way of evidence indicating either Conroy was treated less favorably than similarly situated employees or Conroy was engaged in a protected activity and Hewlett thereafter subjected Conroy to an adverse employment action. Therefore, the evidence is irrelevant, and Hewlett's objection is sustained.

*Background*

Hewlett hired Conroy into its Printing and Personal Systems Organization ("PPS") on October 15, 2007, as an Americas Channel Alliance Manager ("ACAM") in Vancouver, Washington. (Conroy Decl. ¶ 2; Busse Decl Ex. 17 (ECF No. 36).) Conroy received high marks as an ACAM, where she was described by her manager as an employee who "consistently exceeds goals with notable positive impact." (Busse Decl. Ex. 12, at 4.) By July 2012, Conroy transitioned into a new position within Hewlett's PPS: Worldwide Channel Manager ("WWM"). (Busse Decl. Ex. 17; Randell Decl. ¶ 5 (ECF No. 31.).) As a WWM, Conroy also met and often exceeded expectations, again receiving high performance reviews. (Busse Decl. Ex. 15.) In 2012, her manager described Conroy as an employee who "achieves results with her contributions. She is amazing at pulling together a wide variety of teams and producing really outstanding results." (Busse Decl. Ex. 15, at 5.)

However, as both an ACAM and WWM, Conroy believed she was underclassified and underpaid. (Conroy Dep. 32:1-33:21.) Despite being classified as an Expert M-27 in both roles, Conroy believed she was performing the duties, and had the skillset, of the higher-classified Master M-29 position. (Conroy Dep. 32:13-33:6.) As Conroy stated in her deposition, "I was always doing two to three roles under a junior level job description." (Conroy Dep. 32:13-33:6.)

At the time of Conroy's employment with Hewlett, Hewlett was divided into two divisions, consumer and commercial. (Conroy Dep.. 29:4-23.) Conroy was employed in Hewlett's consumer side. (Conroy Dep. 25:7-9, 30:23-25.) However, in 2010, while Conroy continued to work as an ACAM, she was asked to help create her same position on the commercial side, which was to be

advertised as a Services Business Manager position and classified as an M-29. (Conroy Dep. 25:6-15, 30:24-25; Busse Decl. Ex. 13.)

Conroy applied for the newly created M-29 position; however, she was neither given an interview nor chosen for the position. (Conroy Dep. 25:6-15.) Scott Spilker, the hiring manager responsible for filling the Services Business Manager position, stated:

> There are significant differences between commercial sales and consumer sales. A Business Manager in a consumer role interacts with much fewer people than a Business Manager in a commercial role. . . . [Conroy] was not selected . . . because . . . I felt [Conroy] had a negative attitude that would interfere with her ability to positively interact with my team and hundreds of sales representatives and commercial partners. I also was not aware of [Conroy] having any previous experience in a commercial business such as the one I managed.

(Spilker Decl. ¶¶ 5, 7 (ECF No. 38.).)

Conroy believed she had been discriminated against because she "ha[d] already done that role, [had] been asked to define the role, [and had] an interest" in the role, and she raised this concern with her manager, Bao Le ("Le"). (Conroy Dep. 25:16-22, 30:13-21.) Conroy told Le her position existed on the commercial side, that she felt discriminated against because she had not been afforded an interview, and requested Le reclassify Conroy as an M-29 because she was being underpaid in light of the newly created position on the commercial side. (Conroy Dep. 30:23-31:1.) But Conroy's request was rejected, and her classification remained unchanged. (Conroy Dep. 31:2-5.) Conroy's role as an WWM was eventually reclassified as an M-29 in February 2013, but she received no pay increase or bonus. (Conroy Dep. 50:14-21.)

In March 2013, while working as a WWM, Conroy hired and trained Dedes as an independent contractor to assist Conroy with her job duties. (Dedes Dep. 6:17-24, 7:13-14.) Dedes

had previously worked for Hewlett in customer relationship management for eight years, from 2000 to 2008. (Dedes Dep. 8: 13-15.)

In May 2013, Conroy joined Hewlett's Enterprise Group as a Marketing Development Manager ("MDM"). (Busse Decl. Ex. 17; Randell Decl. ¶ 6.) Shortly after moving to the Enterprise Group, Conroy raised pay issues with her manager, Foster, during a focal point review. (Conroy Dep. 56: 4-8.) Conroy explained to Foster she had been underclassified and underpaid while working as an ACAM and WWM, instances Conroy described as "past wrongs that had never been corrected." (Conroy Dep. 56:4-8.) Foster said she knew the background story and would "see what [she] could do." (Conroy Dep. 54:18-19, 55:2.) However, Conroy received just a two percent pay raise, which, due to a steep five percent pay cut in 2007 lasting for several years, only returned her to near her starting salary. (Conroy Dep. 55:2-11.) Foster also gave Conroy her lowest annual-evaluation review since the start of her employment with Hewlett in 2007, though it was still an "achieves expectations" rating, which Conroy explained, "is not a negative review." (Conroy Dep. 56:13-57:1; Busse Decl. Ex. 24, at 5; Conroy Decl. ¶ 7(a).) When Conroy inquired further about pay and her review, Conroy recalls Foster explaining to Conroy that she could not correct past wrongs, was only able to offer her a two percent pay raise, and to find a job elsewhere or work harder and get a higher review if she wanted anything more significant. (Conroy Dep. 56:5-12.) Foster believes she phrased her response differently. (Foster Dep. 20:24-21:6.)

Around the same time, Conroy discovered Willenborg had been promoted from MDM to Global Accounts Manager ("GAM"), where he was classified as a Master M-29, working in Roseville, California, and making a salary of $117,841.31 per year, slightly more than Conroy. (Conroy Dep. 57:2-18; Randell Decl. ¶ 13.) Conroy contends Foster went "to bat" for Willenborg

and obtained the promotion for him, while telling Conroy all she could provide was a two percent raise.

Conroy acknowledges, however, she is unaware as to Willenborg's skill sets and whether he deserved the promotion. (Conroy Dep. 62:11-23, 63:23-25.) She is also unaware of Willenborg's salary or classification when he was an MDM. (Conroy Dep. 62:24-63:5.) She also recognizes Willenborg's GAM position required "a different level of work" and notes GAMs have a higher budget and deal with a small list of specific accounts, regardless of geography, whereas MDMs deal with accounts based on geographic location. (Conroy Dep. 62:11-23, 63:23-25.)

Conroy's move from PPS to the Enterprise Group meant Conroy was working in a separate business unit with separate management structures, and, as a result, Conroy's duties in her previous role did not transition into her new role as an MDM. (Randell Decl. ¶ 7.) Therefore, a vacancy opened and Hewlett began the process of filling Conroy's previous WWM position. (Randell Decl. ¶ 8.) Hewlett advertised the position internally and externally. (Randell Decl. ¶ 8.) During the interim, however, Dedes fulfilled the responsibilities of the WWM as an independent contractor. (Dedes Dep. 6:17-24.) Ultimately, Hewlett offered the WWM position to Dedes. (Randell Decl. ¶ 8.)

Upon hearing that an offer from Hewlett was forthcoming, Dedes asked his hiring manager, Alexander Houcke, if it was possible to receive the same salary he had earned prior to leaving Hewlett in 2008, roughly $130,000 per year. (Dedes Dep. 5:10-15.) According to Dedes, though he was never told affirmatively, the request was granted because, in November 2013, Hewlett hired him into the WWM position earning an annual salary of $130,000. (Dedes Dep. 5:8-20.)

Dedes's salary was higher than the annual salary Conroy received prior to leaving the WWM position. (Dedes Dep. 5:18-20; Randell Decl. ¶ 9.) How much higher remains in contention. In an e-mail Conroy sent to Cee Ann Callahan ("Callahan"), Hewlett's Enterprise Group lawyer, Conroy states Dedes was making $30,000 more per year than Conroy. (Busse Decl. Ex. 27, at 6.) However, Hewlett asserts Conroy earned an annual salary of $108,855.00 with a merit increase, raising her annual salary to $112,644.93. (Randell Decl. ¶ 5.) Conroy later asserts in her declaration that she was making $108,855.00, but makes no mention of the merit increase. (Conroy Decl. ¶ 11.)

"To ensure that its employees are compensated as fairly as possible nationwide without regard to gender," Hewlett maintains a comprehensive salary scale whereby geographic differences are used to adjust pay ranges based on the cost of labor in a given location. (Randell Decl. ¶ 4.) Thus, according to Hewlett, "although Dedes received a marginally higher salary than [Conroy] did while employed in the [WWM] position, the difference was solely due to their differing geographic locations." (Randell Decl. ¶ 9.)

Hewlett further explains that at the time Conroy left the WWM position, her position was classified as M-29, and she received a salary range of 100 percent of the national average – between $98,000 and $115,640 – based on her location of Vancouver, Washington. (Randell Decl. ¶ 10.) In contrast, Dedes was based in Palo Alto, California, which at all times received a salary range of 115 percent of the national average. (Randell Decl. ¶ 11.) The salary band for a WWM in Palo Alto, Californa, was $112,700 to $132,980. (Randell Decl. ¶ 11.) Based on Hewlett's geographic pay ranges, Hewlett maintains, "[Dedes] and [Conroy] are actually similarly situated within their respective pay bands for their individual geographic locations." (Randell Decl. ¶ 12.)

Conroy, by contrast, takes issue with the application of geographic pay policy to Dedes's case. She believes "it is normally not a policy to just give a pay differential based on geography," and "there is clear guidance from [Hewlett] that the increased pay for [geographical differences] is to be used in times of competitive," or tight, labor markets, which did not exist when Dedes was hired. (Conroy Decl. ¶ 11.) Moreover, Conroy states Dedes had "less background, experience and credentials than [she did]," and has no bachelor's degree.[1] (Conroy Decl. ¶ 11; Dedes Dep. 9:7-11.)

In April 2014, when Conroy learned Dedes was making more than she made in the WWM position, she decided to contact Callahan. (Conroy Dep. 23:13-24; Busse Decl. Ex. 25.) Conroy explained to Callahan she had recently learned Dedes was hired into her former WWM position earning a higher salary. (Busse Decl. Ex. 25.) Conroy also explained her past discrimination issues – that she had been underclassified and underpaid in her past positions with Hewlett: "After nearly 7 years," Conroy explained to Callahan, "I am in the lowest quartile of my pay band [with] nearly 30 years of management experience." (Busse Decl. Ex. 27, at 4.) Callahan turned the matter over to Hewlett's Employee Relations Department, and Lori Manders ("Manders"), an employee relations consultant with Hewlett, was asked to investigate Conroy's pay discrimination claim. (Busse Decl. Exs. 26, 27.)

Conroy subsequently met with Manders, where she laid out her discrimination claims. (Busse Decl. Ex. 28.) Conroy agreed not to "seek external avenues until" Manders had a chance to complete an investigation. (Busse Decl. Ex. 28, at 1.)

---

[1] Conroy has a bachelor's degree in communications and holds a Master of Business Administration in international business. (Busse Decl. Ex. 48, at 3.)

Manders thereafter investigated Conroy's claims, and, in May 2014, she informed Conroy her investigation was complete and Conroy's discrimination claims were unsubstantiated. (Busse Decl. Ex. 29). Conroy asked Manders for an explanation, but Manders declined to provide one, citing confidentiality. (Busse Decl. Ex. 30, 31.) Consequently, Conroy informed Manders she would move outside the organization and file a complaint with the EEOC. (Conroy Decl. ¶ 5.)

Also, in May 2014, the Enterprise Group was preparing for a reduction in force. (Cerra Dep. 25:24-26:10.) The Enterprise Group was restructuring, and managers were instructed to retain the best talent. (Cerra Dep. 39:21-25.) Cerra, Vice President of Hewlett's Enterprise Group, maintains that on May 26, 2014, the decision was made to eliminate the MDM positions – Conroy's position – as part of the restructuring. (Cerra Decl. ¶ 4.) The decision was finalized on June 17, 2014. (Hewlett's Resp. to Conroy's Interrog. No. 8.)

On June 3, 2014, Conroy filed an unperfected charge with the EEOC's Seattle, Washington, field office, alleging sex discrimination under Title VII and violations of the Equal Pay Act. (Smith Decl. Ex. 10.) She perfected her charge on June 23, 2014. (Smith Decl. Ex. 11.) On June 9, 2014, Foster was informed Conroy had filed a charge with the EEOC, and Foster informed her supervisor, Cerra, that the charge had been filed. (Foster Dep. 22:15-20; Cerra Dep. 50:1-9.) That year, Foster also learned Conroy had lodged an internal complaint about pay. (Foster Dep. 21:10-12.) Cerra, however, states she was unaware of Conroy's internal complaint. (Cerra Decl. ¶ 3.)

On June 10, 2014, one day after Cerra and Foster learned about Conroy's EEOC charge, Cerra instructed Foster, and other managers under her supervision, to evaluate all employees in her group – including Conroy – in twelve job-related categories, scoring each category on a one-to-five scale. (Busse Decl. Ex. 40.) After each category had been filled, Foster was to add up the scores in

[TJK]

all twelve categories to arrive at a final number for each employee. (Busse Decl. Ex. 37.) Independent of the one-to-five scale, Foster was also instructed to "stack rank" employees on her team from strongest to weakest, which required her to make a "subjective decision" as to where each member of her team ranked. (Busse Decl. Ex. 40; Foster Dep. 56:12-15.)

The twelve job-related categories Cerra asked mangers under her supervision to evaluate were: demand generation, event management, analytics, partner management, product knowledge/depth, sales enablement, market/customer strategy, critical thinking, customer engagement, internal-sales communication, content creation, and attitude. (Busse Decl. Ex. 37, at 2-3.) Cerra developed the rating categories, asking managers to provide a justification for the rankings of employees who fell in the top and bottom ten percent. (Cerra Dep. 30:32-31:3; Conroy Ex. 40.) Cerra did not seek independent verification of her evaluation form from Hewlett's Human Resources Department. (Cerra Dep. 29:17-19.) Additionally, with respect to "attitude," Cerra gave no instruction to her managers as to what that category entailed or how to objectively evaluate an employee's attitude. (Cerra Dep. 30:13-15.) And, in fact, the lack of guidance seems to have created differing views on what attitude was intended to mean: Cerra, on the one hand, indicates that she was using the attitude category to more broadly measure leadership attributes, but Foster was under the impression that attitude was intended to measure whether or not an employee was "positive" and "collaborative." (Cerra Dep. 30:8-12; Foster Dep. 44:8-14.)

In Foster's stack ranking, Conroy received the lowest rating in her group, which comprised eleven Enterprise Group employees working under Foster. (Busse Decl. Ex. 37.) On the one-to-five scale, Conroy tied for the second-to-last score. (Busse Decl. Ex. 37.) According to Cerra, who received Foster's rankings on June 12, 2014, Conroy appeared to be lacking in just about every

Page 19 - OPINION AND ORDER                                                            [TJK]

competency, "based on the evaluation form provided by Ms. Foster." (Cerra Dep. 36:7-11.)  Cerra

acknowledges the final decision to terminate Conroy, rather than to place her into a different role in

the "new organization," was made after Cerra received Foster's ratings. (Cerra Dep. 31:25-31:6.)

Conroy believes she "should have been the highest ranked member of the team." (Conroy

Decl. ¶ 6.)  She points to Koetting, who, as the Enterprise Group Central Region Marketing

Manager, worked with Conroy and other MDMs on Foster's team. (Koetting Dep. 4:6, 5:5-7, 14:25-

15:11.)  In her deposition, Koetting testified she would rate Conroy at the top or in the middle in four

of the twelve categories used by Foster to rate her team; however, Koetting was unable to speak to

Conroy's skills in the remaining eight categories. (Koetting Dep. 14:25-16:19.)  Conroy also points

to Laura Cox ("Cox"), a Hewlett District Manager, who had the opportunity to work with Conroy

for about a year. (Cox Dep. 4:3-16.)  Cox stated Conroy was able to create and execute strategic

marketing plans, engage in good verbal and written communication skills, effectively deal with

customers and partners, and maintain a positive attitude towards her work. (Cox. Dep. 5:10-7:12.)

On July 14, 2014, Cerra told Conroy her job at Hewlett had been eliminated. (Busse Decl.

Ex. 42, at 4-5.)  Cerra explained to Conroy the selection process had been a comprehensive review

"to evaluate [employees'] capabilities in performing the new functions." (Busse Decl. Ex. 42, at 4.)

The restructuring required "a redefinition of roles," which impacted Conroy's position. (Busse Decl.

Ex. 42, at 4.)  Cerra further explained "[t]his was not a personal attack on [Conroy]." (Busse Decl.

Ex. 42, at 5.)  Rather, it "was part of a massive reorganization effort, months in the making, and

carefully planned." (Busse Decl. Ex. 42, at 5.)

Conroy, along with others who were laid off, was provided a two-week redeployment period,

during which time she could post for any internal position at Hewlett and would continue to be on

Hewlett's payroll. (Busse Decl. Ex. 42, at 4.)   The employees selected for layoff were put on a layoff list and other managers could select from the list should they want to add an employee to their team. (Cerra Dep. 34:23-35:4.)   Conroy's low scores in job-specific competencies/skills and leadership, based on the ratings from Foster, were included on the layoff list. (Cerra Dep. 43:21-45:3.) Conroy was unsuccessful in finding a position during her redeployment period; her last day was July 25, 2014. (Conroy Dep. 211:2-4.)

## Legal Standard

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.* at 248. The moving party bears the initial burden of showing "the absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970).  The moving party satisfies its burden by offering the district court the portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court does "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999).

Once the moving party meets its initial burden, the nonmoving party must establish the existence of a genuine issue of material fact. FED. R. CIV. P. 56(e).  To meet this burden, the nonmoving party must make an adequate showing as to each element of the claim for which it will

bear the burden of proof at trial. *Celotex*, 422 U.S. at 322-23. The nonmoving party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). In order to establish that there is a genuine issue of material fact, the nonmoving party "need only present evidence from which a jury might return a verdict in [the nonmoving party's] favor." *Anderson*, 477 U.S. at 257. The evidence set forth must be sufficient to allow a rational jury to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A "mere scintilla of evidence in support of the [nonmoving party's] position [is] insufficient." *Anderson*, 477 U.S. at 252. Additionally, the court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).

The Ninth Circuit has cautioned against too readily granting summary judgment in employee discrimination cases because of "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, exceptions, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). Thus, the Ninth Circuit has set "a high standard for granting summary judgment in employment discrimination cases." *Schindrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Courts require "very little evidence to

survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry–one that is more appropriately conducted by the factfinder upon a full record." *Id.* (internal quotations and citation omitted). Additionally, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder," and thus "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits." *Id.* (quoting *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)).

Nevertheless, the Ninth Circuit holds that the "[f]ailure to allege 'specific facts' that establish the existence of a prima facie case renders a grant of summary judgment appropriate." *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1409 (9th Cir. 1987) (citation omitted). Additionally, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimum prima facie case." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

*Discussion*

## I.  State Gender Discrimination Claim - Violation of OR. REV. STAT. 659A.030

In her First Claim for Relief, Conroy alleges gender was a substantial and motivating factor with respect to her pay. Namely, Conroy argues Hewlett discriminated against her by paying her less than Dedes and Willenborg, similarly situated male employees, in violation of OR. REV. STAT. 659A.030.[2] Hewlett argues Conroy is unable to establish Willenborg is similarly situated. Hewlett

---

[2]In addition to Dedes and Willenborg, Conroy also asserts in a footnote that she experienced less favorable treatment than an unnamed male counterpart. Conroy does not provide a name or detailed information on the man's job duties. There is no way for the court to determine if the male employee was similarly situated. As such, Conroy's pay discrimination claim will be limited to the alleged pay disparity between her, Dedes, and Willenborg.

also contends Conroy is unable to show Hewlett's legitimate, nondiscriminatory reason for the difference in pay between Conroy and both Dedes and Willenborg is pretextual under the balancing test.

Oregon law prohibits an employer from using gender as a basis for employment decisions, or in the terms, conditions, or privileges of employment, including benefits and compensation. OR. REV. STAT. 659A.030. "The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). Under federal law, in order to establish a *prima facie* equal pay claim, an employee "must show that the employer pays different wages to employees of the opposite sex for substantially equal work." *E.E.O.C. v. Maricopa Cnty. Comty. College Dist.*, 736 F.2d 510, 513 (9th Cir. 1984).

The employee bears the burden of showing the jobs being compared are "substantially equal." *Stanley v. Univ. of Southern Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999). The Ninth Circuit applies a two-step analysis for determining substantial equality. First, the court must examine whether the jobs to be compared have a common core of tasks. *Id.* Next, the court determines whether any additional tasks incumbent on one job but not the other make the two jobs substantially different. *Id.* It is "actual job performance requirements, rather than job classifications or titles, that is determinative." *Maricopa*, 736 F.2d at 513. The jobs need not be identical. *Stanley*, 178 F.3d at 1074. "Minor differences in responsibility . . . do not make the equal pay standard inapplicable." *Maricopa*, 736 F.2d at 514. In determining whether the employee has made out a *prima facie* case, it is important to bear in mind that this burden is relatively minimal. *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

[TJK]

Assuming the employee establishes a *prima facie* case, the burden shifts to the employer to show by a preponderance of the evidence the pay disparity is justified under one of four statutory exceptions to the Equal Pay Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earning by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 USC § 206(d)(1); *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986). "These exceptions are affirmative defenses which the employer must plead and prove." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974).

Even if the employer persuades the court it is entitled to an affirmative defense, that is not the end of the story. The employee must be given an opportunity to prove the employer's proffered defense was just pretext, masking its underlying discriminatory motive. *See Stanley*, 178 F.3d at 1076. However, the employee must present meaningful evidence to support a claim that the employer's proffered defense was just pretext; "unsupported allegations made in briefs are not sufficient." *Id.* (internal quotations omitted).

### A. *Conroy's* Prima Facie *Case*

As to Dedes, Hewlett does not dispute he received a higher annual salary than Conroy, nor that Dedes's and Conroy's jobs were substantially similar. Consequently, Conroy established a *prima facie* case of unequal pay as to Dedes. Hewlett also does not dispute Willenborg received a higher annual salary than Conroy while working in his GAM position. Hewlett, however, does argue Willenborg is not similarly situated and that Conroy cannot make out a *prima facie* case as to Willenborg.

To show that jobs compared are similarly situated, an employee must show the jobs' "performance[s] require 'equal skill, effort, and responsibility' and they are performed under 'similar

working conditions.'" *Forsberg. v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir. 1988) (citing 29 U.S.C. § 206(d)(1)). The requirement that the two jobs be substantially equal in "skill effort, responsibility, and be performed under similar working conditions are separate tests, each of which must be met in order" to make out a *prima facie* case. *Id.*

With respect to Willenborg, Conroy does not establish a *prima facie* case. First, she has not shown Hewlett paid Willenborg a different salary while Willenborg worked as an MDM. Second, while Hewlett provided information showing Willenborg made slightly more than Conroy in his GAM position, Conroy has not shown her MDM position was substantially equal to the GAM position in terms of skill, effort, and responsibility. In fact, Conroy admits she and Willenborg had different responsibilities: Willenborg handled global customer accounts, while Conroy's position was geography-based. Additionally, she points out, "there was a different level of work required" to fulfill Willenborg's position as a GAM. The evidence, therefore, shows Conroy exercised substantially different levels of responsibility and effort in her MDM position than Willenborg did in his GAM position. Conroy cannot establish a *prima facie* case as it applies to Willenborg, and therefore the court need not discuss Hewlett's "other than sex" argument for Willenborg's disparate pay.[3]

---

[3]While the court does not discuss Hewlett's "other than sex" argument for Willenborg's disparate pay, the court notes Hewlett argues that, irrespective that Willenborg held a different position, he also was paid a slightly higher salary – $117,841.31 – because of his location in Roseville, California. Hewlett thus argues, as with Dedes, that Willenborg's slightly higher salary was the result of a geographic pay scale, not gender.

[TJK]

*B. Hewlett's "Other Than Sex Argument"*

As discussed, Hewlett does not contest that Dedes received a higher salary and was in a position substantially similar to Conroy. Hewlett, however, does raise the affirmative defense that a factor other than sex accounted for the wage disparity. Hewlett argues it utilizes gender-neutral grade profiles, or geographic differentials, to adjust an employee's salary based on the cost of labor in any given location. Specifically, Hewlett claims, in an effort "[t]o ensure that its employees are compensated as fairly as possible nationwide without regard to gender," Hewlett maintains a comprehensive salary scale, whereby geographic differences are used to adjust pay ranges based on the cost of labor in a given location. (Randell Decl. ¶ 4.)

At the time Conroy left the WWM position, she received a salary range of 100 percent of the national average – between $98,000 and $115,640 – based on her location of Vancouver, Washington. In contrast, Dedes, who was based in Palo Alto, California, received a salary range of 115 percent of the national average, or between $112,700 to $132,980. Hewlett therefore argues Dedes and Conroy received commensurate pay given individual geographic locations.

Conroy argues this reason is merely pretext for underlying gender discrimination. She does not argue geographic pay differences at Hewlett never occur, or that a geographic pay difference is an inadequate reason for disparate pay between similarly situated employees; rather, she states, "there is clear guidance from [Hewlett] that the increased pay for [geographical differences] is to be used in times of competitive," or tight, labor markets, which did not exist when Dedes was hired. (Conroy Decl. ¶ 11.) She further argues Dedes's salary was set at the higher figure not because of geography but because Hewlett used Dedes's prior salary to set his starting salary as an WWM. And finally, she asserts, even assuming she and Dedes received commensurate pay given individual

[TJK]

geographic locations, this alone evidenced discrimination because Dedes was less qualified and less experienced and, in turn, should have started out at a lower salary.

As mentioned, Hewlett contends that a legitimate, nondiscriminatory factor other than sex accounted for the wage disparity. Courts have observed that the "factor other than sex" exception was intended to be broad. *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 877 (9th Cir. 1982). However, the Ninth Circuit has imposed conditions for application of the defense. *Id.* at 876. An employer must first show the proffered factor upon which the wage disparity is allegedly based qualifies as an "acceptable business reason." *Id.* Even if the court finds that the proffered reason is an acceptable business reason, issues of material fact exist if the proffered business reason for wage disparity was not used "reasonably in light of the employer's stated purpose." *Id.*

Hewlett argues the disparity in salary between Dedes and Conroy is based on geographic location, which produces cost-of-living differences and naturally results in disparate pay to ensure its employees are compensated as fairly as possible nationwide. Salary adjustments pursuant to an employee's geographic location are an appropriate means to accomplish a business objective and may be used to establish an employer's affirmative defense. *Russell v. Placeware, Inc.*, No. Civ. 03-836-MO, 2004 WL 2359971, at *12 (D. Or. Oct. 15, 2004). Hewlett's geographic pay scale therefore qualifies an acceptable business reason, entitling Hewlett to use geographic cost-of-living differences to set salaries. Moreover, Hewlett applied its proffered business reason reasonably: Dedes's salary, $130,000 per year, falls squarely within the salary band for Palo Alto, California. Accordingly, Hewlett has persuasively shown Dedes's higher salary was the result of a geographic pay scale, not gender.

Once the employer establishes an affirmative defense, the employee bears the burden of rebutting it with evidence of pretext. *Stanley*, 178 F.3d at 1076-77. Conclusory allegations and denials are insufficient to rebut an employer's asserted business reason for disparate pay. *Id.*; *see also Groussman v. Respiratory Home Care*, CV 84-8283 PAR,1985 WL 5621 (C.D. Cal. Dec. 11, 1985).

Conroy does not dispute Hewlett's use of geographic pay grades. Rather, she argues Hewlett's policy is to increase pay for geographical differences only in times of competitive, or tight, labor markets, which was not the case when Dedes was hired. The only relevant evidence Conroy provides for this assertion, however, is the conclusory statement she makes in her declaration that Dedes was not hired into a competitive labor market. Conroy has provided no competent evidence from which the court can reasonably infer this was the case, or, for that matter, anything by which the court can infer Conroy possessed any personal knowledge of the Palo Alto, California, labor market when Dedes was hired in November 2013. *See* FED. R. CIV. P. 56 (c)(4) (a declaration "used to support or oppose a motion [for summary judgment] must be made on personal knowledge"). Conroy's bare assertion does not rebut Hewlett's showing that its geographic pay band falls under the "factor other than sex" exception and that its policy was applied reasonably in this context.

Conroy also argues Dedes's salary was set at the higher figure of $130,000 not because of geography but because Hewlett used Dedes's prior salary to set his starting salary. Even assuming Conroy is correct and Hewlett set Dedes's starting salary based on his prior salary, that alone would not show the wage disparity was the product of gender discrimination. *Kouba* recognized employers are permitted to use prior salary to base an employee's starting salary and, such action, by itself, is not discriminatory. *Kouba*, 691 F.2d at 878; *see also Wachter-Young v. Ohio Cas. Group*, 236 F.

Supp. 2d 1157 (D. Or. 2002) (holding defendants are entitled to use prior salary to set starting salaries).

Finally, Conroy argues that even assuming she and Dedes received commensurate pay given their disparate geographic locations, this alone evidenced discrimination because Dedes was less qualified and less experienced and thus should have started out at a lower salary. Conroy has failed to provide any meaningful evidence to support this allegation, however, beyond a bare assertions that Dedes had "less background, experience and credentials," and that Dedes did not possess a bachelor's degree. These assertions shed no light on Dedes's previous background and experience in roles similar to the WWM role in which he was hired.

It is apparent Dedes's salary matches his prior salary and falls squarely within the geographic pay band for Palo Alto, California, where he was based. As previously stated, far from being discriminatory, basing an employee's starting on geographic location is a legitimate, nondiscriminatory means to accomplish a business objective . Accordingly, Conroy has failed to raise a genuine issue of fact as to Hewlett's legitimate, nondiscriminatory reason for paying Dedes a higher salary than Conroy. Hewlett's motion for summary judgment on Conroy's equal pay claim is granted.

## II.   State Retaliation Claims - Violation of OR. REV. STAT. 659A.230 and 659A.199

In her Second Claim for Relief, Conroy alleges that, after she complained, both internally and with the EEOC, about what she perceived to be discriminatory pay practices and violations of state and federal law, Hewlett retaliated against her by terminating her in violation of OR. REV. STAT. 659A.199 and OR. REV. STAT. 659A.230.

OR. REV. STAT. 659A.199 and 659A.230 provide protection for public whistleblowers. OR. REV. STAT. 659A. 199 provides that an employer may not "retaliate against an employee ... for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." OR. REV. STAT. 659A.230 prohibits employers from taking adverse action, including discharging, demoting, suspending, discriminating, or retaliating against an employee in any manner based on an employee's good faith reporting of a violation of federal or state law.

This court looks to the Title VII retaliation case law to determine whether a plaintiff has established a *prima facie* claim for retaliation under the Oregon whistleblower statutes. *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 954 (D. Or. 2011) (stating that Oregon's retaliation statutes are typically construed consistently with federal law); *see also Minter v. Multnomah County*, No. CIV-01-352-ST, 2002 WL 31496404, at *6 (D. Or. May 10, 2002) (same). The *prima facie* elements for a retaliation claim under Title VII are: (1) the plaintiff was engaged in a protected activity; (2) the plaintiff was thereafter subjected by her employer to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003).

Hewlett does not dispute that Conroy engaged in a protected activity by filing a charge of discrimination with the EEOC. Nor does Hewlett dispute Conroy suffered an adverse employment action by being terminated. Hewlett only argues that Conroy is unable to establish the existence of a causal link between the adverse action and her protected activity.

### A. Causal Relationship Between Adverse Actions and Whistleblowing

"To establish causation [the plaintiff] must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [the plaintiff's] firing and that but for such activity [the plaintiff] would not have been fired." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002). "[C]ausation may be established based on the timing of the relevant actions." *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000). "Specifically, when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Id.* The Ninth Circuit, in *Miller v. Fairchild Indus., Inc*, 885 F.2d 498, 505 (9th Cir. 1989), held that a *prima face* case of causation was established when the plaintiffs' discharges occurred forty-two and fifty-nine days after the plaintiffs engaged in a protected activity, namely, attending EEOC hearings.

Conroy was notified of her termination forty-one days after filing her initial, unperfected charge with the EEOC, well within the fifty-nine-day time frame deemed adequate to establish a *prima facie* case in *Miller*. Hewlett argues, however, Conroy is still unable to establish a causal link because she cannot show Cerra was aware of Conroy's charge with the EEOC at the time Cerra made the decision to terminate Conroy.

Essential to showing a causal link is "evidence that the [decision-maker] was aware that the plaintiff had engaged in the protected activity" at the time of making the decision adversely affecting the plaintiff's employment. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). In *Cohen*, the plaintiff brought a claim alleging the defendant had retaliated against her for filing a charge with the EEOC. *Id.* at 794. In 1972, the Plaintiff brought the EEOC charge, alleging the

defendant engaged in a pattern and practice of sexual discrimination in hiring and promotion. *Id.*

at 795. In 1973, the district manager under which the plaintiff worked implemented a new policy

in which the position the plaintiff held would be required to work night shifts on a regular basis or

lose the position. *Id.* The plaintiff contacted an EEOC investigator to inform her that she felt she

was being forced to work night shifts because of her EEOC charge. *Id.* As a result, a supervisor

contacted the district manager to inquire about the situation. *Id.* The district manager had not known

of the EEOC complaint and explained the policy had been adopted for a legitimate business reason.

*Id.* The policy went into effect despite the plaintiff's concerns. *Id.*

The Ninth Circuit held the plaintiff could not show a causal link between the adverse

employment action – the night shifts – and the filing of her EEOC complaint because the district

court "expressly found that . . . [the district manager] was unaware that [the plaintiff] had filed a

complaint with the EEOC." *Id.* at 797. Thus, at the time of the decision that directly resulted in the

adverse action against the plaintiff, the manager was unaware the plaintiff had engaged in a protected

activity, breaking "the requisite causal link between the decision to implement the policies and [the

plaintiff's] EEOC complaint." *Id.*

Conroy's situation is dissimilar to *Cohen.* While Cerra states in her declaration the decision

to eliminate the MDM position – Conroy's position – was made on May 26, 2014, she acknowledged

in her deposition the final decision to terminate Conroy, instead of move Conroy, was made after she

received Foster's ratings, on June 12, 2014, two days after Cerra was made aware of Conroy's EEOC

charge. Moreover, Hewlett stated in response to interrogatories that the decision to eliminate the

MDM was not finalized until June 17, 2014. Therefore, unlike in *Cohen*, at the time of the decision

that directly resulted in the adverse action against Conroy, Cerra was aware Conroy had engaged in

protected activity. Thus, the requisite causal link between the decision to terminate Conroy and Conroy's EEOC complaint is left firmly intact.

Conroy has offered evidence which viewed in a light most favorable to her raises a genuine issue of material fact on the existence of a causal relationship between an adverse action and her EEOC charge. Hewlett argues, however, it had legitimate, nonretaliatory reasons for the adverse action and, under the federal burden-shifting framework, Conroy has the burden of proving that nonretaliatory reasons are pretext.

*B. Burden-Shifting Analysis/Legitimate, Nonretaliatory Reasons for Adverse Actions*

Oregon has rejected the federal burden-shifting scheme; in other words, "a plaintiff who establishes a *prima face* case of discrimination under Title VII [] survives summary judgment on the corresponding discrimination claim" under Oregon law. *Whitley v. City of Portland*, 654 F. Supp. 2d 1194, 1212 (D. Or. 2009). However, the Ninth Circuit has held that *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting, and not Oregon's "*prima-facie* only" rule, applies to Oregon Chapter 659A claims in federal diversity cases. *Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2001). The court thus analyzes Conroy's retaliation claim under the federal framework.

Under the federal *McDonnell Douglas* burden-shifting framework, once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer shows a nondiscriminatory reason, the burden shifts back to the plaintiff to prove that the defendant's nondiscriminatory reason is mere pretext. *Id.* A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty.*

Page 34 - OPINION AND ORDER                                                                 [TJK]

*Affairs v. Burdine*, 450 U.S. 248, 256 (1981). While the mere existence of a *prima facie* case is insufficient to preclude summary judgment, a plaintiff "need produce 'very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext." *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995) (quoting *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991)). "To survive an employer's summary judgment motion, only a genuine factual issue with regard to discriminatory intent need be show, a requirement that is almost always satisfied when the plaintiff's evidence, 'direct or circumstantial, consists of more than the [presumption established by the three-pronged *prima facie* case test].'" *Lam v. Univ. Of Hawai'i*, 40 F.3d 1551, 1559 (9th Cir. 1994) (quoting *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991). "The same evidence can be used to establish a *prima facie* case *and* to create a genuine issue regarding whether the employer's explanations are pretextual." *Strother v. S. Calif. Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996).

"[E]vidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant." *Passantino*, 212 F.3d at 507. In *Strother*, the Ninth Circuit determined there was enough evidence to get past summary judgment because the plaintiff not only produced two letters rebutting the defendant's claim that the adverse employment action was based in part on the plaintiff's poor interpersonal skills, but also because the plaintiff suffered adverse employment actions days and months after filing a charge with California's Department of Fair Employment & Housing. *Strother*, 79 F.3d at 870-71.

Likewise, significant and rapid changes in an employee's evaluations, combined with testimony from the employee and from coworkers that the evaluations lack credence, can be sufficient to show that an employer's proffered, nondiscriminatory reason for an employee's

[TJK]

termination is pretextual. *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044 (9th Cir. 2009). In *Boeing Co.*, the EEOC brought an action against the employer on behalf of a terminated employee, claiming the employer's decision to terminate the employee was retaliatory, thus violating Title VII. *Id.* The employee, who had worked for the defendant for over a decade, received a positive evaluation from her supervisor in 2001, obtaining a "meets expectations" or higher in ten categories. *Id.* at 1047. That same year, the defendant substantiated a sexual harassment claim that the employee had filed. *Id.* A year later, in October 2002, the defendant conducted a reduction in force, which affected the employee's department. *Id.* at 1048. In order to determine whom to terminate, the defendant conducted a workforce-reduction evaluation on a number of workers, including the employee. *Id.* The same supervisor who had provided the employee with a positive review in 2001, scored the employee significantly lower in a multitude of categories on the workforce-reduction evaluation. *Id.* The employee even received a zero, reflecting no knowledge or experience, in several categories, despite the fact that the employee's "own statements and prior [] evaluations had indicated she possessed at lease some knowledge or experience in these areas." *Id.* Shortly thereafter, the employee was terminated, allegedly based on her poor evaluation. *Id.* at 1048. The employee, however, argued her termination was in retaliation for filing the aforementioned sexual harassment claim. *Id.* at 1051.

In concluding that the EEOC produced sufficient evidence to show the employee's poor evaluation was pretext, the court focused on three pieces of evidence. First, the court noted that the stark contrast in the employee's evaluations had occurred over a short period of time and the employee's supervisor provided no substantive explanation or "point[ed] to any concrete conduct, specific complaints, or written records indicating" the change was warranted. *Id.* at 1052. Second,

the court found particularly pertinent the testimony provided by a number of the employee's coworkers, stating the employee was a good team member and that "her skills warranted higher scores than she received." *Id.* As the court stated, "[c]oworker testimony is particularly relevant here because it would allow a jury to infer that [the defendant's] proffered reason for termination – a poor [] evaluation – was not only inaccurate, but is simply unworthy of credence." *Id.* Finally, the court pointed to the employee's own detailed testimony about why her low scores were wrong and unworthy of credence. Such evidence, the court stated, is relevant and should be considered by a jury. *Id.* at 1052-53.

Conroy has provided evidence in which a jury could infer that Hewlett's nondiscriminatory reason for termination is pretextual. Indeed, the facts here are analogous to both *Boeing Co.* and *Strother.* First, as in *Boeing Co.*, Hewlett was going through a substantial reduction in force. Mangers were instructed to retain the best talent, and Cerra instructed her managers to evaluate all employees pursuant to an evaluation form she developed. Like the employee in *Boeing Co.*, Conroy received a poor evaluation; she appeared to be lacking in nearly every job-specific competency. Hewlett, argues this warranted her termination. However, there is substantial evidence in which a jury could infer that this is pretextual.

Just as in *Boeing Co.*, the rankings Foster provided Cerra, where Conroy was ranked last and second-to-last in her group, were in stark contrast to Conroy's recently received annual performance evaluation, where Foster gave Conroy an achieves expectations rating. Moreover, Hewlett is unable to offer any nonconclusory explanation regarding the discrepancy between Foster's stack ranking, where Conroy finished last, and Foster's one-to-five rating , where Conroy tied for the second-to-last score.

The discrepancies in Foster's evaluations of Conroy are compounded by the fact that Cerra's ranking system required Foster to evaluate an employee's attitude without providing Foster any explanation as to what "attitude" entailed or a method by which she could objectively evaluate an employee's attitude. As Foster admits, she simply made subjective decisions as to where each member of her team ranked.  And, in fact, the subjective nature of the attitude category is illustrated in Cerra's and Foster's differing views on what attitude was intended to measure.  While Cerra inserted attitude as a category for managers to measure, she intended to use the category to more broadly measure leadership attributes.  But she apparently did not communicate this to Foster, who was under the impression that "attitude" was intended to measure whether or not an employee is positive and collaborative. Yet the record contains no evidence that Cerra was aware or took into account the fact that Foster had evaluated employees under a differing definition of attitude than Cerra had anticipated.  Based on this evidence, a jury could reasonably infer that Hewlett's proffered reason for termination – a poor evaluation – was both inaccurate and unworthy of credence.

Finally, similar to the employees in *Boeing Co.* and *Strother*, Conroy has pointed to assertions made by coworkers that Conroy, far from lacking in every competency, as her evaluation seemed to indicate, appeared to excel in many aspects of her job.  Conroy has also provided the court with her own detailed testimony stating that her low scores were inaccurate and unreliable.  These factors, along with the temporal proximity of the adverse employment action to Conroy's EEOC complaint, are sufficient to raise a genuine issue of material fact as to Conroy's retaliation claim. Conroy has, thus, presented sufficient evidence to support her claim for retaliation under Oregon's whistleblowing statutes.  Hewlett's motion for summary judgment on Conroy's Second Claim for Relief is denied.

*Conclusion*

Defendants' motion (#28) for summary judgment is GRANTED with regard to Conroy's First Claim for Relief for gender discrimination and DENIED on Conroy's Second Claim for Relief for retaliation under OR. REV. STAT. 659A.230 and 659A.199.

> IT IS SO ORDERED.
>
> DATED this 31st day of March, 2016.

> _____
> JOHN V. ACOSTA
> United States Magistrate Judge